UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | File No. 1:14-cr-06-jgm |
| | : | |
| KAYLEIGH BUTLER, | : | |
| Defendant. | : | |
| _____ | : | |

RULING ON MOTION TO SUPPRESS
(Doc. 15)

I.     Introduction

Defendant Kayleigh Butler ("Butler" or "Defendant") is charged with possession with intent to distribute heroin.  (Doc. 1.)  Butler moves to suppress evidence obtained during an interview at the Burlington police station in the early morning hours of July 18, 2013, arguing her Fifth Amendment constitutional rights were violated.  (Doc. 15.)  The government opposes the motion. (Doc. 16.)  The Court held an evidentiary hearing on July 21, 2014, and heard testimony from Burlington Police (BP) Officer Kristian Young ("Officer Young") and BP Sergeant Paul Petralia ("Sergeant Petralia").  Both Butler and the government filed additional briefing following the hearing.  (Docs. 20, 23.)

For the reasons stated below, the Court grants Defendant's motion in part.

II.     Background

The following facts are taken from the testimony and evidence presented at the July 21 hearing, and from other documents submitted as evidence by the parties.  On July 17, 2013, at approximately 11:40 p.m., Burlington Police officers responded to a reported robbery in a parking lot.  Officer Young checked the welfare of Butler, who had reported the robbery and was rubbing her face, and observed one man leaving the parking lot on the street and another through the woods.  Butler stated the first man was her friend.  Officer Young briefly pursued the other man

through the woods.  Butler told the police that, while sitting in her car, the driver and passenger side doors were opened, she and her friend were sprayed with mace, and her car keys and one purse with a wallet were taken.  Sergeant Petralia observed four bundles of what appeared to be heroin on the ground near the driver's side door.  He also knew Butler's friend to be a frequent drug user.

At approximately 12:15 a.m., Butler agreed to accompany Officer Young to the police station to discuss the robbery in more detail.  She also consented to a search of another purse, in which several syringes were observed.  During the ride, they discussed Butler's work with children as a nanny and Officer Young stated she did not have to accompany or speak with him.

Once they arrived at the station, at approximately 12:30 a.m., Butler went to the restroom to tend to her eyes and then was taken into an unsecured "Victim/Witness room."  Officer Young reiterated that she did not have to answer his questions and was free to leave:  she could "just walk right out that door."  Among questions about the robbery and why she was in the parking lot, Officer Young asked if she was under the influence of drugs or alcohol.  Butler stated she was not then under the influence.  When asked about the syringes found in her purse, Butler said they belonged to a friend with diabetes.  She said she used to shoot cocaine but had not used for weeks. Butler was hard to understand because she was mumbling and trailing off, and kept closing her eyes. Young Test.

Officer Young asked about the heroin bundles and began to press about the details of the robbery, stating it appeared Butler met her friend in the parking lot for reasons other than a ride. He intimated that she sprayed herself with the mace by mentioning other drug-related thefts he had been involved with when people purposely hurt themselves or lied about the events.  In response, Butler stated "Ok, I'm done with this conversation."  Gov't Ex. 1.  After Officer Young responded

by reiterating he was only saying what he had seen in the past, she said again, "I'm done. I'd like to go home. You guys can drop me off." Id.

Officer Young told Butler they would not be giving her a ride, that she could call someone and take a seat in the lobby of the station. He said she should think about what happened and that he knew she was not telling the truth. The interview, which lasted about twenty-five minutes, concluded at approximately 1:00 a.m.

Butler did not take a seat in the lobby, but instead left on foot. Meanwhile, Officer Young reported to Sergeant Petralia that Butler wanted to leave. Petralia went to the lobby, saw Butler walking away from the station, and pursued her in an unmarked police car. Petralia Test. She was about 100 yards from the station when he approached her, explaining she was now being detained and was required to return to the station. She followed his instructions and returned to the station. Id.

Sergeant Petralia escorted Butler to the same Victim/Witness room, and he and Officer Young commenced a custodial interview with Butler at approximately 1:13 a.m. Sergeant Petralia began the interview with remarks regarding use of police resources, and noted other information they had gathered, including discussions with her friend who had been in the parking lot with her. He advised her that she should put herself in the "best situation," and emphasized her status as a childcare provider and the effect her "potential situation" could have on that work, noting "I am not trying to be threatening, but . . . ." Gov't Ex. 3. Petralia testified that his statement was meant to communicate to her that she could lose the right to work with kids, and to induce her to cooperate.

Sergeant Petralia then advised Butler of her Miranda rights. Butler was sobbing throughout this portion of the interview. At the conclusion of the advisement, Petralia presented Butler with the waiver form, read the last paragraph to her, and ended with "[k]nowing my rights I agree to

3

waive them and talk with you now." Gov't Exs. 2-3.  She signed the form after asking the date.
The time recorded is 0117, which the parties agree was 1:17 a.m.  Officer Young testified Butler was
emotional and crying throughout the entire interview.

Before questioning Butler, Sergeant Petralia again urged her to put herself in the best
situation, informed her it is a crime to falsely report events, and stated he knew the meeting in the
parking lot involved heroin.  While Butler continued to cry and sob, she made several inculpatory
statements about her distribution of heroin and its source.  Sergeant Petralia told Butler that
"everyone makes mistakes," and, given that she had never been arrested before, there was "no
reason we can't work through this."  Gov't Ex. 3.  About halfway through the interview, Sergeant
Petralia left the room.  Officer Young asked Butler if she was alright and told her "nothing's gonna
happen to you over, what, a few bundles of heroin?  Nothin's gonna happen."  Gov't Ex. 3.  He
then asked questions regarding the number of heroin bundles and the price of the drugs, eliciting
further inculpatory statements from Butler.  At the conclusion of the interview, Butler was arrested
for distribution of heroin.

III.    Discussion

The initial burden of production and persuasion generally rests upon the defendant at a
suppression hearing.  United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980).  The Fifth
Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness
against himself."  U.S. Const. amend. V.  The privilege "permits a person to refuse to answer
questions, in formal or informal proceedings, where the answers might be used to incriminate him in
future criminal proceedings."  United States v. Ramos, 685 F.3d 120, 126 (2d Cir. 2012).  An
individual must be advised of Fifth Amendment rights before custodial interrogation.  Miranda v.
Arizona, 384 U.S. 436 (1966).

4

The government bears the ultimate burden of establishing by a preponderance of the evidence that law enforcement officers properly advised an accused of his Fifth Amendment rights and that he made a knowing and voluntary waiver of those rights.  Miranda, 384 U.S. at 444; Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).  Both the waiver and subsequent statement must be knowingly and voluntarily made. Generally, a suspect who reads, acknowledges, and signs a waiver form before making a statement has knowingly and voluntarily waived Miranda rights.  United States v. Plugh, 648 F.3d 118, 127-28 (2d Cir. 2011).  "'[K]nowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception."  United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014).  The parties agree that in assessing the defendant's comprehension and voluntariness of the waiver, the court must look to the totality of the circumstances.  (Doc. 15 at 9, Doc. 16 at 11.)  See also id.  This includes the characteristics of the defendant, i.e., background, experience, and conduct, the setting surrounding the statement, and the conduct of the officers.  North Carolina v. Butler, 441 U.S. 369, 374-75 (1979); Taylor, 745 F.3d at 23-24.  Other relevant factors include the defendant's age, education, and intelligence, failure to give Miranda warnings, length of detention, nature of the interrogation, and use of physical punishment.  United States v. Guarno, 819 F.2d 28, 30 (2d Cir. 1987) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

The Court concludes under the totality of the circumstances, Butler's waiver was not voluntarily made.  Butler is a young woman with no prior arrests or significant experience with the criminal justice system who was visibly upset and sobbing during the interview and, more specifically, during the time she was advised of her rights.  The first officer to interview her, Officer Young, testified Butler was hard to understand, her eyes were closed, and she kept trailing

5

off.  After Butler effectively ended the interview by leaving the Victim/Witness room, Young told

her she should think about her situation.  She left the police station after being told she was free to

go but -- within minutes of leaving -- was made to walk back to the station and taken into custody.[1]

Before advising her of her <u>Miranda</u> rights, Sergeant Petralia prefaced his advice with an

extended discussion, including remarks regarding the waste of police resources, other damaging

information the police had gathered, and her status as a childcare provider.  As discussed earlier,

Petralia highlighted Butler's work with kids and the effect her "potential situation" could have on

that work.  Petralia testified that his statement was meant to communicate to her that she could lose

the right to work with kids and to induce her to cooperate, the first step of which was waiving her

<u>Miranda</u> rights.  After this lead-in, during which Butler sobbed, it took less than two minutes from

the commencement of the advice to the moment she signed the waiver form, which included the

time she was prompted.  She signed the waiver after one o'clock in the morning following an

incident in which Butler was allegedly robbed and sprayed in the face with mace.  The police had no

new information during the few minutes when Butler terminated the non-custodial interview and

her subsequent waiver after Sergeant Petralia returned her to the station as an official "detainee" and

delivered his pre-<u>Miranda</u> rights advisement statement.

The Court finds this entire chain of events softened her resistance, and ultimately overbore

her will, and led to an involuntary waiver of her right to remain silent.  Even though Butler was not

physically threatened or punished, the government has not carried its burden:  the totality of the

---

[1] The Court notes law enforcement could have detained Butler at the scene, but chose
instead to ask her to voluntarily go to the police station.  Sergeant Petralia testified she could have
been detained from the moment the heroin by the driver's side door was discovered and that
nothing had changed from their knowledge at the scene to the time she was detained.

circumstances demonstrates Butler did not make a knowing and voluntary waiver of her <u>Miranda</u>

rights.  <u>See</u> <u>Taylor</u>, 745 F.3d at 23.  Accordingly, Butler's subsequent statements must be suppressed.

The Court notes that while the statements must be suppressed based on the involuntariness

of Butler's waiver of her <u>Miranda</u> rights, there is also evidence her later statements may also have

been involuntary.  The law enforcement officers advised Butler nothing would happen to her over

such a small amount of drugs given that she had never been arrested before.  These promises,

together with the mentioned threat to her work with children, are sufficient to conclude Butler's will

was overborne and rendered her subsequent statements involuntary.  <u>See</u> <u>Plugh</u>, 648 F.3d at 127

(noting "voluntary means by deliberate choice free from intimidation, coercion, or deception);

<u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991) ("A confession is not voluntary when

obtained under circumstances that overbear the defendant's will at the time it is given.").

Butler also argues her statements during the first interview -- which she concedes for

purposes of the motion was not custodial -- should be suppressed.  (Doc. 15 at 6.)  Because she was

not in custody, no advisement of <u>Miranda</u> rights was required at the outset of her first visit to the

police station.  (Doc. 21 at 8-9.)  She contends, however, that she invoked her right to remain silent

during the non-custodial interview and law enforcement officers did not "'scrupulously honor'" that

invocation.  (Doc. 15 at 5-9 (quoting <u>Michigan v. Mosely</u>, 423 U.S. 96, 104 (1975).).[2]  The

"scrupulously honor" requirement does not apply to interviews in non-custodial settings.

---

[2] Butler also cites the Second Circuit's recent decision of <u>United States v. Okatan</u>, 728 F.3d 111 (2013), for the proposition that law enforcement must cease questioning after an individual free from custody invokes her right to remain silent.  (Doc. 23 at 7.)  Given that the <u>Okatan</u> Court was deciding "whether the prosecution may use a defendant's <u>assertion of the privilege</u> against self-incrimination during a noncustodial police interview as part of its case in chief," and held that it may not, 728 F.3d at 119 (emphasis added), Butler is overreaching.  Here, Butler seeks to keep statements made during the non-custodial interview out of the government's case, not the fact that she chose to assert her right to remain silent.

See Mosely, 432 U.S. at 100-01.  Considering the totality of the circumstances surrounding the non-custodial interview, her statements were voluntarily made.  When she wished to stop conversing with Officer Young, she took him at his word and terminated the interview and stated she was done with the "conversation" and left.  The Court finds her will was not overborne.  Accordingly, Butler's statements made during the non-custodial interview need not be suppressed.

IV.    Conclusion

For the above reasons, Defendant Kayleigh Butler's motion to suppress (Doc. 15) is GRANTED in part and DENIED in part.  Her statements made to law enforcement during the non-custodial interview are admissible.  Her statements made during the custodial interview are suppressed.

This case will be placed on the first trial calendar after December 1, 2014.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 6th day of October 2014.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge

8